IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| SHEILA M. NORRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:05-0067 |
| | ) | |
| HARTFORD LIFE & ACCIDENT INSURANCE COMPANY, | ) | Judge Thomas A. Wiseman, Jr. |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION

Plaintiff Sheila Norris brings this action *pro se* action under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001–1461 ("ERISA") against Defendant Hartford Life & Accident Insurance Company ("Hartford"), challenging Hartford's termination of her long-term disability benefits under a group insurance policy, policy number GLT-204731 (the "Policy") issued by Hartford to Mercy Health Services ("Mercy Health"), Norris's former employer. In accordance with the scheduling Order entered on February 25, 2005 (Doc. No. 7), Norris filed her Motion for Judgment on the Administrative Record on June 1, 2005 (Doc. No. 12). In response, Hartford filed its own Motion for Judgment on the Record and supporting Memorandum on July 1, 2005 (Doc. Nos. 15 and 16). Norris then filed a second document entitled "Plaintiff's Motion for Judgment" (Doc. No. 17), but which is in essence a response to the arguments set forth in Hartford's Motion. Consequently, both the plaintiff's motion and the defendant's motion for judgment are ripe for consideration.

Having reviewed the record as a whole and for the reasons set forth more fully below, the Court will GRANT Defendant's Motion for Judgment and DENY Plaintiff's Motion for Judgment.

**I. BACKGROUND**

Norris was employed by Mercy Health from February 29, 1988 through December 7, 1992 as an accounts receivable clerk. She was covered by the Policy at the time she went on disability leave on December 8, 1992 with a diagnosis of "an arthritis problem" and "fibrositis/myositis." (Administrative Record ("AR") 949, 947.) She was 37 years old at the time. (AR 947.)

The Policy at issue covers Norris for long term disability ("LTD") benefits provided she continues

to meet the definition of Total Disability and other Policy requirements. More specifically, the Policy defines "Totally Disabled" during the six-month "Elimination Period" (AR 4) and the subsequent 24 months as being "prevented by Disability from doing all the material and substantial duties of [the insured's] own occupation on a full time basis." (AR 7.) Thereafter, Totally Disabled means being "prevented by Disability from doing any occupation or work for which [the insured is] or could become qualified by training, education or experience." (Id.) In addition, the Policy expressly provides that Hartford has "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions" of the Policy. (Id. at 6.)

Norris applied for and Hartford accepted her claim for LTD benefits beginning December 8, 1992; her benefits became effective June 8, 1993, after expiration of the Elimination Period. (See AR 1022 (7/7/93 Ltr. giving notice of approval of claim).) Even at that point, however, Hartford's internal notes indicate reservations about approval of the claim. (See AR 1028 (noting "Restrictions and TD [total disability] do seem to warrant more investigation").)

In fact, Hartford reconsidered its decision to grant benefits just a few months later, in October 1993, and gave notice to Norris that it was terminating her benefits on the basis that her former job matched the job restrictions imposed by both her treating rheumatologist and an independent medical examiner. (AR 880–81.) Norris appealed that termination through Hartford's administrative appeals process, however, and the decision to terminate benefits was reversed in December 1993. (AR 849.) In May 1995, Hartford again notified Norris that her benefits would terminate effective June 8, 1995, after which time the definition of Total Disability for coverage purposes changed, as indicated above, to cover only disability that prevented her from performing any job. (AR 694–97.) However, as set forth in a letter dated June 2, 1995, Hartford again reconsidered its decision and continued to provide LTD benefits based upon additional information provided by Norris. (AR 664.)

Thereafter, Hartford continued to request and receive regular reports from Norris's treating physicians regarding her disability status. It also had her undergo additional independent medical examinations and a functional capacity evaluation, and finally, during May and June of 2003, had her tailed by a private investigator to determine what types of activities she performed on a daily basis. On

2

the basis of the information obtained through the investigator as well as through the various independent examinations, Hartford concluded that Norris no longer met the Policy definition of Totally Disabled. Therefore, in a letter dated September 26, 2003, Hartford again notified Norris that her LTD benefits had been terminated. (See AR 309–14.) Norris appealed the determination (AR 234–35), but it was upheld on April 28, 2004 by a Hartford Appeal Specialist. (See AR 84–87 (4/29/04 Ltr to Pl.'s Counsel fr. Hartford, giving notice of upholding of prior decision).)

Having thus exhausted her administrative remedies, Norris filed the present ERISA action under 29 U.S.C. § 1132(a)(1)(B)[1] to reinstate LTD benefits and to recover past due amounts she claims are due to her under the Policy. Both parties seek judgment as a matter of law on the administrative record.

**A. The Administrative Record: Plaintiff's Medical and Disability History, 1991 – 2003**

Although the record reflects that Norris alleges she was involved in an automobile accident some time in 1988, the medical records included in the Administrative Record reflect that she apparently did not complain to her treating physician at the time, Dr. Robert Anderson, about any chronic pain or problems from at least December 1988 up until August 1991. (See Administrative Record ("AR") at 1066-71[2].) In August 1991, however, Norris suddenly began complaining to Dr. Anderson that she had been "profoundly fatigued" for the past two to three weeks. Except for night sweats and inability to sleep, however, "[s]he [did] not have any other symptoms." (AR 1065.) Dr. Anderson noted she "has been under a moderate of stress [sic] with the organizational changes which are occurring around her job . . . , a sister who attempted suicide . . . , and the loss of her grandfather recently." (AR 1065.)

Two weeks later, on August 30, 1991, she presented to Dr. Anderson with symptoms of a cold, and again complained that she was "profoundly fatigued." (AR 1064.) Her laboratory studies were, however, "essentially normal." (Id.)

---

[1]Also referred to as ERISA § 502(a)(1)(B).

[2]These records reflect that she complained about abdominal pain some time in the winter of 1988 which was "back to normal essentially" in December 1988 (AR 1071). She had an upper respiratory infection in February 1989 (AR 1070); pain in her ankle in July 1989 (AR 1070); another upper respiratory infection and sinusitis in January 1991 (AR 1068); and pain in her right calf and right knee in or around April 1991 (AR 1067).

3

A few months later, on November 8, 1991, she had changed jobs and was working in a doctor's office. She told Dr. Anderson she was "under a moderate degree of stress," had "developed a lot of symptoms of tightness in her trapezius muscles," and was "having a lot of difficulty with neck pain at night." (AR 1062.) This is the first indication in the Administrative Record that she was suffering from or had ever suffered from any type of back or neck pain.

On February 10, 1992, Norris presented with acute symptoms of an upper respiratory infection as well as a urinary tract infection, and continued "difficulty with her neck and upper back." (AR 1060.) Dr. Anderson noted at that time that she "probably has myofa[s]cial syndrome." (Id.) A week later, on February 18, Norris was complaining of pain in her rhomboid muscles which she thought was related to "a lot of lifting at work." (AR 1059.)

The next entry in the record from Dr. Anderson is dated nearly six months later, in July 1992, at which time Norris was complaining about "a great deal of difficulty with pain" in her neck radiating into her trapezius muscles and shoulders, and generally being fatigued in the neck and shoulders. She was prescribed physical therapy, to include ultrasound, heat, massage, and cervical traction, as well as the medication Relafin. (AR 1058.)

Norris had eight sessions with a physical therapist beginning on July 17, 1992 and continuing until August 21, 1992. (AR 1035–41.) Although the physical therapist's treatment note for August 21, 1992 says "cont[inue] P.T.," Norris did not actually continue after that date. (AR 1036.) The "Discharge Letter" in her file, dated September 15, 1992, notes that she was referred for treatment of neck, shoulder and back pain, and presented with "chronic pain at cervical and low back," though her medical records from that time frame do not reflect that she was complaining about low back pain. (AR 1035.) Very little progress was noted over the course of her eight sessions. (AR 1035.) The Discharge Letter further commented, "It should also be noted that pt [patient] reported to physician's secretary that I and another therapist had recommended CT scan which is not true." (AR 1035.) The patient was discharged from physical therapy without having met the goals set for such treatment. (AR 1035.)

In October 1992, Norris presented with complaints of "a great deal of difficulty with pain" in her right calf. She was prescribed rest and Ibuprofen. (AR 1057.)

4

In November 1992, Norris told Dr. Anderson that she had undergone multiple physical therapy treatments without significant benefit. She also told him (though the physical therapy notes do not corroborate her statement) that the "people in physical medicine" had recommended that she be seen in the Chronic Pain Clinic and the University of Michigan Medical Center. Dr. Anderson instead recommended that she see Dr. Dale Baker, an arthritis rheumatologist. (AR 1056.) Dr. Anderson noted that she was not suffering from any systemic symptoms, such as night sweats, but that he was concerned that she might have "fibromyositis or a fibromyology because of her generalized aches." (Id.) Dr. Anderson remarked, for the first time in this record, that he recognized "a relationship of her onset of symptoms to an automobile accident that occurred some several years ago." (Id.) Norris also told him her symptoms were "exaggerated when she sits for a long period of time at a computer at her desk." (Id.)

As a result of Dr. Anderson's referral, Norris was examined by Dr. Dale Baker for the first time on December 8, 1992. In a letter from Dr. Baker to Dr. Anderson of the same date, Dr. Baker related Norris's history, apparently from Norris' perspective, indicating she had been in a car accident in 1988, that she did not experience pain right away but the night after the accident the pain became quite severe, "and this has been an on going problem over the past years." (AR 945.) Her problem has gotten progressively worse in her most recent job, such that the "pain is so severe that she has difficulty going to work and functioning." (Id.) Dr. Baker noted that Norris also complained of low back pain, about which she had not previously complained to Dr. Anderson. (Id.)

Dr. Baker stated he believed Norris had fibromyalgia,[3] or a "fibrositis/myositis type picture," based upon his assumption that there was "an initial injury from the automobile accident which caused

---

[3]A diagnosis if fibromyalgia generally indicates pain in fibrous tissues, muscles, tendons, ligaments, and other sites. Merck Manual of Diagnosis and Therapy, § 5, ch. 59; see also AR at 118, 132 (citing studies), 133. Fibromyalgia can be characterized as a widespread chronic pain syndrome lasting at least three months with the presence of tenderness upon palpation at eleven of eighteen established areas of the body. See Wolfe MB, et al., The American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia, Report of the Multicenter Criteria Committee, 33 Arthritis and Rheumatism 160, 161 (1990). Under the American College of Rheumatology criteria ("ACR criteria"), widespread pain is defined as pain in the left and right sides of the body, as well as above and below the waist. See id. Axial skeletal pain, defined as pain in the cervical spine, anterior chest, thoracic spine, or low back, must also be present. See id.

this problem, and the problem has persisted to the present time. It was then aggravated by her current job up to the point where she can no longer function." (AR 946.) Dr. Baker took her off work immediately and placed her on medical leave "for a while," though he doubted she would be able to work at all in her current job and therefore "really need[ed] to find another job." (Id.)

On December 12, 1992, just after Norris saw Dr. Baker for the first time and was put on disability leave, she allegedly was involved in another car accident, but the record is unclear as to whether that alleged accident had an exacerbating effect on her symptoms. (See AR 940 (1/1/93 Treatment Note from Dr. Baker, mentioning accident but not indicating any exacerbation of symptoms); 954–69 (ER notes from 12/12/92, noting she was a walk-in patient reporting involvement in vehicular accident, presenting at the ER with complaints of "some pain in her neck and back," and noting chronic back pain from prior vehicular accident, but exhibiting no objective symptoms); but see AR 924 (4/23/94 Ltr. from Dr. Baker to Dr. Anderson noting Norris's condition had been "markedly worse" since December 1992 car accident).)

At any rate, Dr. Baker continued to extend Norris's disability leave month by month for the next several months on the basis of her "arthritis problem," as he referred to it in each of his disability leave orders (see, e.g., AR 865, 937, 939). Norris's condition apparently improved somewhat over that time period and then reached a plateau. For example, in January 1993, Dr. Baker noted Norris was "doing relatively well" off work and that "there was no question that the work she was doing was irritating and cause [sic] an aggravation of her problem." (AR 940.) The symptoms Dr. Baker noted then were "pain and discomfort in the upper back and neck area, and . . . chronic spasm and fullness to the muscles there." (AR 940.) In April 1993, Dr. Baker found she "continue[d] to have pain and discomfort in the muscles of the upper back and neck area, and . . . considerable spasm in these areas." (AR 924.) In May 1993, she was "about status quo" except now she was complaining of pain in her arms, elbows, and forearms, in addition to the pain in her upper back and neck. (AR 1017.)

Finally, in November 1993, Dr. Baker opined that Norris would never be able to return to her previous job or any job that put stress on her upper extremities or upper back and neck. (See AR 937, 865; see also AR 863 (11/10/93 Ltr from Dr. Baker to C. Johnson, Hartford Claims Administrator

reiterating his belief that Norris was unfit for return to work).) During this time frame, the medications she was taking included Robaxin, a muscle relaxant, and Motrin as needed. (See AR 946, 897.)

Meanwhile, in connection with the alleged December 1992 accident, State Farm Insurance Company had Norris examined by Alvin Brown, M.D., Staff Physiatrist with American Medical Evaluations, on March 17, 1993. According to Dr. Brown's report, Norris's complaints of neck, upper back, shoulder, and arm pain radiating down to her elbows were of approximately three months duration. (AR 928.) She attributed her complaints to the December 1992 accident. (AR 928.) Unlike Dr. Baker, Dr. Brown noted "minimal tenderness" over the cervical spinous processes and "no associated palpable spasm." (AR 930.) In fact, Dr. Brown further noted:

> There were no objective nor subjective findings upon this evaluation, including x-ray studies and electrodiagnostic testing, to substantiate a diagnosis of a disabling neuromusculoskeletal condition at this time. In fact, there is not a single objective finding throughout the course of this entire examination clinically, radiographically nor electrodiagnostically.

(AR 931–32.) Consequently, Dr. Brown believed that Norris was capable of resuming all previous work and routine activities immediately with no restrictions, and State Farm denied her claim. (AR 931–32.)

In addition, Hartford had Norris evaluated by two different independent examiners during 1993. The first was conducted on March 4, 1993 by orthopedist Michael Holda, M.D. with Consolidated Medical Services. (See AR 1117–19.) According to Dr. Holda, Norris reported that she suffered daily, continuous pain in her neck that was "pretty bad . . . , unbearable at times." (AR 1117.) She also complained of associated headaches, pain in the top and back of both shoulders that was worse on the right, mid-back pain, and pain in her right arm "to the mid-aspect." (AR 1117.) The pain increased with coughing or sneezing and was aggravated by activity involving the upper extremities and by sitting and doing computer work for eight to ten hours. (AR 1117.) She allegedly wore a cervical collar to drive or while doing any strenuous activity. Norris also complained of "occasional" ("less than weekly") low back pain. (AR 1117.) Norris related her pain to injuries sustained in the February 1988 and December 1992 car accidents. (AR 1118.)

Dr. Holda noted, in his objective findings, that Norris sat comfortably and was able to get up from a sitting position normally, walk normally, and get on and off the examining table without difficulty.

7

Range of motion tests were limited by Norris's complaints of pain, but there was no tenderness or spasm in her neck or shoulders, no atrophy in her arm muscles, and no other objective findings. (AR 1118–19.)

Dr. Holda nonetheless diagnosed fibromyositis purely on the basis of her subjective complaints of pain and suggested she be restricted from work over shoulder level on a repetitive basis and from computer work. He felt she could perform a sedentary job as long as she was not using her hands continuously in a computer-type job. He was not sure whether the restrictions should be permanent, however, and recommended she be re-evaluated after two months. (AR 1119.)

Consequently, Hartford commissioned another examination, this time performed on August 16, 1993 by Dr. Steven Schultz from the University of Michigan Department of Physical Medical and Rehabilitation. According to Dr. Schultz's report, Norris's chief complaints were chronic neck, shoulder, arm, and upper back pain that stemmed from a February 1988 motor vehicle accident in which she reportedly sustained a whiplash-type injury. She claimed she experienced no immediate pain following the accident, but had gradually increasing pain in the neck and shoulders as the day wore on and was unable to get out of bed the next day as the pain was so severe. (AR 896.) She continued at her job as accounts clerk at St. Joseph Mercy Hospital, "work[ing] with pain," and treating with her family physician, Dr. Anderson, and by rheumatologist Dr. Baker. (Id.) She claimed to have been involved in a second traffic accident in December 1992 which, according to Norris, aggravated her symptoms. (Id.) More specifically, Norris complained of "constant, severe pain" in her neck, upper trapezius, interscapular area, both shoulders, wrists, and elbows, with occasional pain in her lower back. (AR 897.) She also complained of sleep disturbances, including difficulty falling asleep as well as waking up at night with position changes. (AR 897.) Norris claimed her pain was aggravated by any activity involving the upper extremities.

Dr. Schultz's physical examination revealed "a pleasant, cooperative woman in no acute distress" who was "able to move freely about the examination room" and did not "manifest any overt pain behaviors." (AR 897.) She exhibited asymmetrical shoulder heights and "diffuse tenderness" throughout the region in which she complained of pain in her neck and back, with "multiple taut bands

8

in these muscle groups." (AR 898.) Her cervical range of motion was markedly limited by self-reported pain, but otherwise her range of motion was normal, and neurological examination revealed "normal muscle bulk and tone, normal walking without difficulties." (AR 898.)

Dr. Schultz also diagnosed myofascial pain disorder involving the cervical and upper thoracic spine, and chronic pain syndrome. He nonetheless felt that Norris would benefit from a trial of low-dose tricyclic antidepressant medications as well as a self-directed home-exercise program. (AR 898.) Dr. Schultz recommended that she be returned to work with restrictions of no lifting over ten pounds from waist level to shoulder height, no overhead lifting or reaching, and that she be given a sit/stand option. (AR 899.) Dr. Schultz also emphasized that while she might continue to have pain, she would not incur any additional injury by resuming work. (AR 899.)

Based in large part upon Dr. Schultz's IME, Hartford issued a decision in October 1993 to discontinue Norris's LTD benefits. (AR 880–81.) Norris gave notice on November 5, 1993 that she appealed the decision. (AR 871.) On November 16, 1993, the Hartford wrote Norris in response to her appeal letter, clarifying that it was denying her claim for LTD benefits on the basis that an independent evaluation by Dr. Steven Schultz released her to work with restrictions (e.g., no lifting over ten pounds from waist level to shoulder level; no overhead lifting or reaching) that were consistent with the demands of her prior position. (AR 866–67.) The letter noted that Dr. Baker, while insisting that Norris was disabled, was unable to provide any objective findings in support of his finding or, more importantly, to provide a medical opinion regarding her physical capacities that would make her unable to perform the duties of an Accounts Receivable Clerk. (AR 867; see also AR 896–99 (Schultz IME Report); 1012 (Physical Capacities Evaluation Form dated June 1993, in which Dr. Baker noted that he "not smart enough to know all these answers"); 983 (Attending Physician's Statement of Continued Disability, dated August 12, 1993, in which Dr. Baker again stated he was not "smart enough to know the answers" to the questions on the form regarding restrictions); 862–64 (11/10/93 Ltr. from Dr. Baker, complaining about the vagueness of the disability form provided by Hartford and stating the questions were unanswerable as phrased).) Nonetheless, Hartford reversed its decision to terminate benefits in December 1993. (AR 849.)

9

On February 25, 1994, Norris underwent an "Upper Extremity Assessment" by Susan Judkins, OTR. Ms. Judkins noted that Norris reported "constant pain in her upper extremities," and that she was being treated for arthritis of the upper extremities by Drs. Anderson and Baker. She presented with "extreme guarded movement and posturing involving the _entire_ body not just the upper extremities." (AR 827 (emphasis in original).) Judkins noted that Norris's "verbal reports of pain and guarded postures do not coincide with objective findings or palpations of the cervical region. . . . Ms. Norris self terminated all test areas and needed prompting to complete tasks." (AR 829.)

In June 1995, Ms. Norris was approved for Social Security benefits, retroactive to June 1993. (AR 658–59; 668–72.).) Thereafter, Norris also continued to receive LTD benefits from Hartford until the termination giving rise to this suit.

Norris's medical records during the interim indicate as follows:

**_Dr. Dale Baker, 2/17/1998 through 9/21/00 (Michigan):_**

2/17/98: Notes patient is "doing _OK!_" She has lost 22 pounds and is eating less "but feeling great." (AR 511.)

3/12/98: Notes Norris is doing okay but still having usual pain and discomfort. Patient reports she has not been a lot better in Georgia and is moving to Tennessee for various reasons. (AR 509.)

5/4/98: Notes Norris has moved to Georgia [likely means Tennessee] and they are happy there. Notes that "[u]nfortunately on April 8th the patient and her daughter were rear-ended by a car when they were sitting at a stop light. Since that time she has had some increased pain and discomfort in her back and neck muscles, but I think that is an aggravation of her already present fibromyalgia." (AR 510.)

10/13/98: Notes patient is doing "OK" in Tennessee. (AR 509.)

8/19/99: Patient "doing pretty well considering her fibromyalgia and chronic pain. I think she looks a lot better and is markedly improved over when she was working." (AR 508.) "Apparently there was some question about [the rheumatologist in Nashville] filling out her papers for her, but I agree with the patient they have to go by what happened historically here, because she is so much better now, which is primarily related to not working. . . . P[atien]t remains disabled in my best judgment, and I don't

10

think she will ever be able to return to gainful employment given the circumstances." (AR 508.)

12/21/99: "Pt doing – SQ [status quo]" (AR 507.) Medications are noted to include Robaxin, Celebrex, Paxil, Elavil, Pamelor, and a diuretic. (AR 507.)

4/18/00: "Status quo," and "doing pretty well for her," but "will not be able to return to work." (AR 506.)

9/21/00: Again notes "status quo." (AR 505.)

**Dickson Family Medical Group (Melissa Thompson, P.A. -C.), Lyles, Tennessee, 1/17/99 – 2/26/02:**

1/17/99: New patient, recently moved from Michigan. States history of fibrocystic breast disease, fibromyalgia, lupus and asthma. Notes current medications including Robaxin, Daypro, Paxil, Ibuprofen, vitamin E and B complex. (AR 534.)

4/27/99: Complaints of bi-lateral leg pain, some in hips but mainly in calf area. No numbness, tingling or radiating. Notes fibromyalgia has been "pretty much under control," but in the last couple of weeks she has been having a lot of lower leg cramping. No objective findings but ordered venous Doppler test. (AR 531.)

5/12/99: Follow-up appointment for leg-cramping. Venous Doppler negative. Denies any upper leg pain or back pain. Impression is left leg cramping. Prescribe Celebrex and HCTZ (diuretic). (AR 530.)

6/10/99: Complaints of intermittent epigastric pain, no obvious source, no objective findings. Doctor orders various tests. (AR 529.)

8/10/99: Complaints associated with urinary tract infection. Denies low back pain. Medications prescribed. (AR 528.)

1/12/00: Well-woman visit, states "she has been doing fairly well." Current medications include: Paxil, Robaxin, Celebrex, Pamelor, HCTZ, and Plaquenil, but may be off Celebrex and Plaquenil, given samples of Evista. (AR 525.)

4/4/00: Comes in for medication refills, complains of sleep deprivation. Pamelor is not working. Elavil worked before but made her gain weight. Medications refilled, given samples of Ambien. Plan to taper off Pamelor. (AR 524.)

11

5/9/00:  Complaints of intermittent knee discomfort.  No abnormalities noted.  Recommended that she follow up with physical therapist for strengthening.  (AR 524.)

8/31/00:  Complaints of right hip pain resulting from fibromyalgia "acting up" and still has not been sleeping well.  Has taken self off most of her medications because no longer has insurance to cover it, so no longer taking Paxil or anti-inflammatory medication.  Objective:  notes full range of motion in back, tenderness over right lumbar para spinal muscles and sacral joint only.  No trigger-point tenderness.  Plan:  started back on Paxil and Mobic.  Instructed to return for follow up in two weeks.  (AR 522.)

11/29/00:  Complaints of low back pain into buttocks for 2 days radiating down back of her leg and making toe feel tingly and numb.  Says this feels different from fibromyalgia pain.  Impression:  right sciatica.  Given injection of Depo-Medral, instructed to increase Mobic.  (AR 521.)

1/15/01:  Follow up for fibromyalgia, medication refills of HCTZ and Premarin.  Changed from Paxil to Effexor and instructed how to taper off Paxil. (AR 520.)

5/1/01:  Follow up for fibromyalgia.  States she has not been doing well for past 6 weeks because she has been out of Mobic but is doing "okay" with some joint discomfort.  Notes full range of motion in upper and lower extremities.  Refilled Celexa and Mobic.  (AR 519.)

6/11/01:  Follow-up visit for fibromyalgia.  Notes more problem with depression.  Husband is "very sick and they are trying to sell her house."  Increased Celexa dosage.  (AR 518.)

9/6/01:  Problems with sciatic nerve, fibromyalgia "acting up."  Notes complaints of wrist and low back pain but "not as bad as in the past."  "Approximately six months ago her fibromyalgia acted up and we had given her a steroid injection.  She stated that helped immensely.  She did not have a problem until this week."  (AR 1357.)  Medications include Mobic and Celexa.  [It is notable, however, that ten months earlier (not six months) she complained of sciatic pain that was "different from" the fibromyalgia," and it was the sciatic pain for which she was given the steroid injection.  See Note for 11/29/00, supra.  Norris appears to associate all her aches and pains with fibromyalgia.]

10/29/01:  Notes that she continues to complain of low back pain and right sciatic nerve "bothering her again."  She also states she occasionally has some tingling in her feet.  "She's had a

history of fibromyalgia with sciatic nerve problems for quite some time." (AR 1353. 1356.)

1/15/02: Complaints of low back pain and pain in hips. Medication refills. (AR 1353, 1355.)

2/26/02: Complaints of "low back pain that started yesterday, like her normal pain but somewhat more severe. She has a history of having a lot of low back discomfort due to her fibromyalgia." She also complained that her thighs and backs of her legs have been aching and feeling extremely heavy and that her feet occasionally tingle. (AR 1353–54)

***Dr. Dale Baker (continued), 5/17/01 through 5/13/ 03 (Michigan):***

5/17/01: "As before." Changed prescription from Paxil to Celexa, HD for blood pressure, Mobic and Robaxin. Complaints of pain in knees. (AR 504.)

9/27/01: Patient "basically status quo," living in Tennessee but visits family in Michigan several times a year. Patient had "all the same symptoms that she had previously," including "pain and discomfort to the upper back, neck, arms, and leg areas" (AR 1199), in addition to "fatigue, and other complaints." (AR 1200.) Dr. Baker also noted at that time that Norris had a primary care physician in Tennessee and that Baker himself only saw her "a couple of times a year now." Dr. Baker wrote a letter to Hartford based on the same examination in which he reiterated his opinion that there had been no appreciable change in Norris's condition over the years "except that she has shown some improvement since she has been off work, which is to be expected." (AR 1201.) Dr. Baker reiterated his belief that Norris was permanently disabled and would never be able to return to any type of gainful employment, and if she did return to work, she would get worse and would not be able to do the job." (AR 1201.)

6/5/02: Letter from Dr. Baker to Dr. Taylor noting that Baker believed Norris had fibromyalgia and chronic pain, particularly consistent pain and discomfort in the upper back and neck, "but also in the lower extremities." (AR 1203.) He noted she had been treated for depression and anxiety in relation to her physical problems, and that there were no significant abnormal laboratory tests or x-rays.

6/19/02: Dr. Baker filled out an "Attending Physician's Statement of Disability" for the Hartford in which he diagnosed Norris as having fibromyalgia and, secondarily, hypertension. For physical examination findings, he listed "Pain and tenderness in the muscles of the upper back, neck, and upper extremities with spasm and swelling at times." (AR 1205.) He noted he treated her two to three times

13

per year.  (AR 1205.)  Under the "Impairment" section, requesting detailed information about the extent of the patient's limitations, he stated "As before – [patient] permanently disabled – will never be able to return to gainful employment."  (AR 1206.)

On the same date, Norris completed a Claimant Questionnaire in which she described the medical conditions that prevented her from working as including:  "Fibromyalgia, Depression, Hypertension, Back & Hip pain, knee pain, pain and tenderness in the muscles of my upper back, neck, shoulders and upper extremities, Depression causes inability to function."  (AR 1186.)  She further stated that her condition had "retrogressed" in the past eighteen months and that she was then suffering from chronic fatigue, that stressful situations aggravate her condition, and that she was unable to be around people because of pain, irritability and depression.  (AR 1186.)  She further stated she suffered from headaches and forgetfulness.  (AR 1186.)

When asked to list what type of activities she engaged in during the course of a typical day, Norris stated:  "Unable to engage in activities due to pain.  Activities aggravate my condition.  I take medication and rest to avoid pain.  Walking, standing and lifting are limited due to pain."  (AR 1186.)

7/9/02:  Dr. Baker wrote Dr. Taylor a letter indicating he had seen Norris in his office that day, stating:  "As you probably know, I see her periodically when she comes back to Michigan for a follow up check up, and hopefully maintain her disability situation."  (AR 1207.)  He also mentioned it "would not be necessary to see her back all the way up here since there are not any changes to be made, and things could be taken care of down there if you would want to do that. . . .  I think she would need periodic insurance forms filled out stating that to maintain her situation.  If you would be willing to do this there would be no need for her to come up here, although I would certainly be glad to see her anytime."  (AR 1207.)

5/13/ 03:  Letter from Dr. Baker to Dr. Taylor stating that he saw Norris in his office again that day; that he had been seeing her once or twice a year since she had moved to Tennessee; that she had, in his opinion, "reached a plateau" but had continued pain and discomfort.  He noted she had received a letter from Hartford demanding that she present for an examination, and that she was "concerned because on a given day she might look pretty good, and unless one knows the history here

she is worried they may say she can return to work."  (AR 1208–09.)

***Dr. John Taylor,  6/6/02 through 7/21/03 (Portland, Tennessee):***

5/17/02:  Dr. Taylor noted this is a new patient who complained of hypertension and hyperlipidemia, and low back pain going into her hips and legs.  She reported fibromyalgia and chronic pain.  Dr. Taylor discussed her conditions with her and refilled medications.  (AR 430–31.)

8/13/02:  Complaints of bi-lateral knee pain of several years duration.  Doctor noted "mild crepitus" with "flexion/extension" but no swelling.  (AR 428–29.)

10/30/02:  Notes Norris complained of back pain, "Low back pain every y[ea]r 2 w[ee]ks after she gets flu shot; she also asked to be taken off Lortab and put on something else.  Objective findings of "no low back pain on palp[ation]."  (AR 426–27.)

1/15/03:  Norris complained of low back pain radiating down her left leg as a result of falling and hitting tail bone two weeks ago.  Naprocyn prescribed.  (AR 424–25.)

3/27/03:  Complaints of bi-lateral pain and welling in calves of legs for two weeks (pain noted to be 8 on a 0-10 scale); Dr. Taylor noted no swelling, no pain on palpation and no other physical findings other than mild crepitus in knees; ordered fasting bloodwork and arterial Doppler.  (Both ultimately negative.) (AR 420–21.)

5/19/03:  Prozac prescription renewed.

6/6/03:  Complaints of bilateral knee pain though no swelling nor tenderness was noted.  (AR 259.)  She was also concerned about possible hearing loss, but hearing test was normal.  (Id.)  Patient requested and received orthopedic referral.  (AR 258.)

7/17/03:  "Ph[one] to Freds for anxiety Rx Buspar"  (AR 258.)

7/21/03:  Note states:

C/o Discuss Disability
Extended discussion re: disability for fibromyalgia
P[atien]t accompanied c/ husband and both are "disabled" and both participate in the conversation.
No exam done today but lengthy discussion.
They want a copy of the report from the insurance company and I would not give it to them.
They have concerns re: the previous doctor retiring and who would sign their papers to continue their disability status.
I explained to them that I do not do disability exams and do not have the testing

15

available to do objective evaluation.
They say they hate "people" and could never work with people or stand to be around them.
"They want a doctor who will sign the paper every year and will need to find another doctor who will meet their needs."
I agreed and said that would probably be best and would give them sufficient time to seek medical care elsewhere.

(AR 257, 256.)

***Dr. Robert S. Collins, Middle Tennessee Orthopaedics, 6/18/03 through 8/27/03:***

6/18/03: Medications are noted to include Prozac, naproxen, Flexaril, HCTZ, and Premarin. Notes that she describes her fibromyalgia as "involving all her joints." She claimed to have trouble with her knees since adolescence, and claims to have dislocated or partially dislocated a patella in 1982. She did not have surgery, but claims to have had persistent problems that had been treated in the past with physical therapy and anti-inflammatory medications. She was unable to describe her physical therapy. (AR 1360.) Despite few objective findings, Dr. Collins diagnosed Chondromalacia of the patella, fibromyalgia (based on her statements), and tight hamstrings. The patient stated she felt the only thing that would help was surgery. Dr. Collins disagreed and recommended physical therapy. "She objected to this saying that if she was able to do regular exercise then it was felt that should could work and would lose her disability. I'm not sure if this is the case but I think she needs a conservative program of therapy." (AR 1359.)

8/27/03: Norris claimed she attended one physical therapy session but could not afford the co-payments and was "set up on an exercise program." Because she was unable to describe the stretching or strengthening exercises she was doing, Dr. Collins suspected she was not actually doing them. [Record incomplete] (AR 1359.)

***Cumberland Family Practice, 8/8/03 through 11/17/03:***

8/8/03: Notes only "[h]as been on diet for cholesterol," and "[s]aw ortho before re: chondromalacia - needs to go back." (AR 1327.)

11/17/03: Listing prescriptions and doses (including Premarin, HCTZ, naproxen, Flexeril, [Illegible], and Trazodone), noting she was in for follow up on medication and prescription refills, and that she complained of low back pain. (AR 1324–25.)

16

**B. The Administrative Record:  Surveillance Video and Notes**

As part of the process of reviewing Norris's LTD claim, Hartford engaged a private investigator to conduct surveillance of Norris's daily activities.   Surveillance was conducted on April 10 and 11, 2003; May 12, 13, 14, 20, 21, 27, 28, and 29, 2003; and June 14–15, 2003.  The investigator prepared a written report, provided video that captures some of Norris's activities, and interviewed one of Norris's neighbors..   (AR 1159–60 (surveillance DVDs); 192–230 (investigators' reports); 191 (Witness Statement).)

A summary of the investigator's notes and the surveillance videotape follows:

May 13, 2003:  Subject was observed as she was leaving Dr. Baker's office.   She appeared to "ambulate in a normal fashion" as she stepped off the curb and into the vehicle.  (AR 200.)  From there she went to private home at which a cook-out was apparently being held.  (Id.)

May 20, 2003:  The investigator arrived on the scene around 5:20 as Norris was leaving her residence with her husband.   They drove to another private residence and stayed there until approximately 7:10 p.m.  (AR 206.)

May 21, 2003:  Norris was observed going from her home to Dr. Taylor's office around 8:30 a.m. and was seen walking quickly into the building.   Around 8:50, she walked to her vehicle and then back into the building.  Surveillance was terminated.  (AR 207.)

May 27, 2003:  Norris was observed entering and exiting the trailer and the new residence being constructed on-site, climbing and stepping up onto the retaining wall and onto the porch of the new residence being constructed on the premises.  (AR 211–12.)

May 28, 2003:   Norris traveled to Healthsouth Rehabilitation Center ("Rehab Center") in Gallatin, Tennessee for Norris to undergo a Functional Capacity Evaluation ("FCE") at Hartford's request.  She and her husband arrived at the Rehab Center around 7:40 a.m.  After parking the vehicle, Mr. Norris got out and walked around to help his wife out.  He opened the car door for her—and this is the only time on the surveillance tapes that he does so—and Sheila Norris swung both feet out at the same time, rocked forward and stood upright with apparent effort.   She walked slowly to the building and her husband opened the door for her.  Her pace was markedly slower than at all other times during

which she was filmed.  (AR 212.)

At 9:32, Norris left the Rehab Center and walked down the sidewalk of the strip mall in which it was located.  Her gait appeared normal at this point.  She continued down the sidewalk, including going up a few stairs without using the handrail.  At one point she twisted at the waist and neck to look back toward the Rehab Center and then continued walking to the end of the strip mall.  About five minutes later, she entered a Verizon Wireless Store and was observed examining the wall display and talking with the shop attendant.  A few minutes later, she exited the store and walked back toward the Rehab Center.  At one point she stopped abruptly, turned around and walked in the other direction and into Shipley Donuts.  Several minutes later, she exited the shop and walked the length of the strip mall.  Her gait was normal and pace fairly quick.  She was carrying a soft-drink bottle as well as the white Fed-Ex type envelope she had been carrying all along.  She walked all the way to the end of the strip mall, turned around back toward the donut shop, stopped and scanned the parking lot, probably looking for her husband, and walked back into the Donut Shop.  (AR 213.)

At 10:13, after Norris had been walking around the strip mall for nearly forty-five minutes, her husband arrived back in the parking lot.  (AR 213.)  From there, Norris and her husband traveled to the bank across the street, a Wendy's restaurant, a Windows & Doors store (AR 214), and then to a Home Depot store 29 minutes away in north Nashville.  (AR 215.)  At each stop, Norris was observed exiting the vehicle, walking to and from whatever retail establishment, and then getting back into the car; her movements were fluid and quick, with no slowness of gait, no hesitation, and no evidence of difficulty turning or twisting.

After Norris had already spent two hours after her FCE appointment shopping and riding in the car, Norris and her husband shopped at the Home Depot for approximately forty-five minutes (from 11:33 a.m. until 12:16 p.m.).  (AR 215–16.)  While inside the Home Depot, Norris was observed to select a shopping cart and push it through the store.  Once inside, besides shopping, she stood at the paint counter for at least ten minutes.  (Id.)  When they left, Norris was pushing the shopping cart while her husband carried the dog.  She popped open the car trunk remotely and then raised it with her right hand to the full open position.  She placed two paint trays and two plastic bags into the trunk, then

18

grasped the trunk lid and closed it.  She then pulled the cart toward the passenger side door, picked up a one-gallon paint can with her right hand, switched it to her left hand as she used her right hand to open the car door, and bent at the waist to place the paint can on the floor inside the car.  She then closed the car door, spun the cart around, returned it to the store, walked back to the car and got in.

(AR 216.)  All of these movements appear on the surveillance video to be swift, pain-free, and confident.

Norris and her husband returned home from the Home Depot around 1:30.  The investigator trailed them from enough distance that they were already inside by the time he got to their house.  No further activity was observed that day.  (AR 216.)

Thursday, May 29, 2003:  By 8:40 a.m., Norris's vehicle was not present in the driveway.  She was observed returning to the house around 10:25.  Norris was seen removing items from the car trunk and placing them in the storage shed on site.  Over the next hour, she was observed walking back and forth between the trailer, the new residence and the metal shed several times.  (AR 217–18.)

Later in the afternoon, Norris and her husband drove for approximately an hour back to the Rivergate area, where they stopped at Color Tile Flooring Store.  Surveillance was terminated shortly thereafter.  (AR 219.)

June 15, 2003:  Norris was observed once again going to the Home Depot with her husband and dog.  After parking in the lot, they walk about 50 feet and enter the store; Norris was carrying the dog.  Once inside, she is observed bending her head back to look up at a selection of bathroom fixtures.  According to the investigator, she showed good range of motion and did not appear to be in any physical or emotional distress.  Shortly thereafter, she walked by the investigator and turn rapidly to her left to glare at him, so he left the store to observe from outside.  (AR 228–29.)

A few minutes later, Norris and her husband returned to their car.  She was carrying a box approximately one by one and a half feet, resting it on her abdomen.  The trunk of the car was popped open remotely and she opened it fully with her right arm while still resting the bulky and apparently heavy box on her abdomen with her left hand.  She then bent at the waist to place the box in the trunk.  As the investigator noted, she stood upright in a single uninterrupted motion and walked to the

19

passenger door to get in the car.  (AR 229.)

From the Home Depot, the Norrises traveled to a Taco Bell, where they parked in a handicap spot.  They went in and then came out abruptly, left and drove across the street to the Jack-In-the-Box where they also parked in a handicap spot.  Fifteen minutes later they exited the restaurant and got back in the car, where they sat for another twenty minutes, apparently eating.  Norris got out, walked to the trash bin near the door to throw things away, got back in the car, and the car drove away.  (Id.)

From there, they traveled to the town of Dickson, Tennessee, arriving around 3:20 p.m. at a private residence.  The investigator left at 5:00 p.m., by which time the Norrises had not yet departed. (AR 230.)

The investigator at that point was instructed not to continue surveillance.  (Id.)

**C.  The Administrative Record:  Functional Capacity Evaluation, Independent Record Review, and General Response to Surveillance Evidence**

As indicated above, Norris underwent a Functional Capacity Evaluation on one of the days during which she was video-taped by an investigator.  The evaluator's notes make it obvious that the effort Norris put forth during the FCE was significantly at odds with her actual capabilities as indicated by the activities in which she engaged during the rest of the day.

***HealthSouth Functional Capacity Evaluation:***

The comprehensive FCE was preformed on May 28, 2003 by a physical therapist with HealthSouth, who opined that Norris was capable of functioning at a sedentary level.  The therapist reported that Norris "completed test activities at occasional levels due to [complaints of] fatigue and frequent rest periods.  Unable to perform any tasks repetitively except gripping due to same [complaints of] pain and fatigue.  Patient demonstrates self limiting behavior with rest breaks required despite no appreciable increase in heartrate.  Inconsistencies noted also with high coefficients of variation on grip and isometric strain gauge test."  (AR 1526.)  In her narrative report, the physical therapist also stated:

> Sheila Norris reported moderate pain at an intensity of 5 (0 = no pain; 1, 2, 3 = lw; 4, 5, 6 = moderate; 7, 8, 9 = severe; 10 = emergency pain).  She reported that pain ranges from 3 at best to 10 at its worst.  She states that vacuuming, lifting, any prolonged activity aggravates back symptoms, and that rest provides relief.  *Perceived abilities including: sitting 10 minutes, standing 10 minutes, walking 10 minutes, driving 10 minutes, and lifting 0 lbs.*

(AR 1528 (emphasis added).)

During the screening, the physical therapist observed with regard to Norris's walking gait: "slow cadence, otherwise unremarkable." (AR 1529.) Norris reported limited range of motion but "move[d] through functional ranges." (AR 1529.) Norris was unable to complete the endurance/aerobic capacity portion of the test, "due to [patient] only walking 3 minutes prior to stating that she needed to stop due to fatigue. Patient ambulating at slow speed of 1.0 mph. Heartrate increased to 100 bmp with 3 min. of ambulation under 60% of max. Pt. ambulated another 2 min. on treadmill at a separate time, again requesting to stop due to fatigue, heartrate again maintained under 60%. Overall low work effort based on heartrate." (HR 1520.) Again, it is worth noting that this FCE occurred on the same day she was observed later to walk, shop, and ride in a vehicle for a total of over four hours.

***Dr. Michael O'Hanlan, Independent Medical Record Review, 8/6/03:***

Dr. Michael O'Hanlan, a Board Certified Rheumatologist with the University Disability Consortium, performed an independent medical record review of the file of Sheila Norris, including the FCE and surveillance notes and videotape. (AR 321–26.) In his August 6, 2003 report, Dr. O'Hanlan noted that Norris had complaints of chronic myofascial pain dating from at least 1992 to the present, and that "the medical records support a diagnosis of chronic perceived musculoskeletal/Myofascial pain," but that "more recent physical examinations . . . indicate no significant limitations on physical musculoskeletal examination." (AR 325–26.) Thus, in large part because the contrast between Norris's activities on the surveillance videotape and her self-reported limitations at the FCE on the same day, Dr. O'Hanlan determined there was

> no evidence in the medical records that the claimant would be unable to sustain full time employment activity. There are no sufficient findings in the medical records to document any significant physical restrictions or limitations. The claimant appears to be limited solely by self reported claims of moderate to severe musculoskeletal pain.
> The current treatment of the claimant involves limited rheumatology evaluations over the last several years. The claimant would be better served by referral to a physical medicine and rehabilitation specialist who was associated with a chronic pain management center and a suitable rehabilitation facility.

(AR 326.)

Dr. Baker, when asked to respond to the contents of Dr. O'Hanlan's report, sent a letter to Hartford dated August 11, 2003 in which he stated, again, that he believed Norris to be medically

disabled and unable to return to any type of gainful employment.  He further stated that the fact that she was able, as demonstrated in the surveillance video, to "walk, climb a ladder, walk up stairs, and move around town doing shopping, etc., [did] not mean that this lady can work. . . .  You have no comments, or tapes of this lady working at any job.  That is the thing which this lady can not do over a sustained period of time, and the information you provided does not indicate otherwise."  (AR 1504.)

Dr. Baker further stated that he completely disagreed with the comments made by Dr. O'Hanlan in his independent medical record review.  Specifically, Dr. Baker found it "unbelievable" that a physician would "render a judgment regarding a patient[']s medical condition simply by reviewing someone else's records without ever having examined the patient, or taken a direct history from the patient, and better understanding the medical problems involved. . . .  I do not believe it is reasonable to make medical judgments on that type of scant information."  (AR 1505.)  Further, Dr. Baker stated:

> In cases like this, one has to know the history having seen the patient on multiple occasions, and understanding the problems they have.  Patients with this type of medical situation of course the main problem is pain and discomfort, and of course it is going to be self reported, and I would disagree with Dr. O'Hanlan's comments, not only regarding the fact that he states there is no medical evidence the claimant is unable to sustain full time employment activity, but also would disagree that the patient would be better served by referral to physical medicine and rehabilitation, since I do not believe that would make any difference in this case.  Patient has had many trials of physical therapy in the past.
> Therefore, I believe there is not evidence that you have presented that would change my opinion.  My opinion is based on seeing and knowing this patient over a number of years. . . .

(AR 1505.)

Dr. O'Hanlan replied in a letter to Hartford dated September 10, 2003, stating simply that "[t]here is not sufficient information in the medical records that would document significant physical impairment to [the] patient returning to the work force."  (AR 317.)

### Hartford's Employability Analysis Report, 8/14/03:

Hartford produced an "employability analysis report" dated August 14, 2003 based upon Norris's education, training and work history and functionality considerations based upon Dr. O'Hanlan's medical records review and the FCE.  (AR 334–51.)  This report identified several jobs Hartford found to be available and prevalent in the national economy and within Norris's capabilities.  (See AR 335.)

### Dr. Dale Baker Medical Opinion, 2/17/2004:

22

After Hartford had terminated Norris's benefits but before the appeal had been decided, Dr. Baker filled out a "Medical Opinion Form" dated 2/17/04 at Hartford's request, and after he had had the opportunity to review the surveillance video of Norris), in which he estimated Norris' physical limitations, stating that she could, among other things, lift or carry 1 to 20 pounds "infrequently," that she could bend at the waist, reach above her shoulders, stand on a hard surface, and use hands for fine manipulation "occasionally," but otherwise stated unequivocally, "there is no way she can carry on any gainful employment due to chronic pain/discomfort." (AR 1362–64.)

### Dr. Andrea Wagner Medical Record Review, 4/13/2004:

On April 13, 2004, Dr. Andrea Wagner from the University Disability Consortium issued a report of her "Medical Record Review" of Sheila Norris. On the basis of her comprehensive record review, Dr. Wagner diagnosed chronic pain syndrome. She also noted, however, that while the record reflected longstanding subjective complaints of pain and numerous physical examinations, none of the records demonstrated any evidence of physical impairment or neurological deficit, or any diagnostic testing indicating any significant organic condition. According to Dr. Wagner, although Dr. Baker had diagnosed fibromyalgia, such a diagnosis did not preclude full-time sedentary functionality. (AR 111.) She further stated that Dr. Baker's records do not contain any evidence of an impairment or condition that would preclude full-time sedentary functionality. (AR 111.) Indeed, she noted that the need for restrictions is based solely upon Norris's subjective complaints. (AR 111.) Despite Norris's subjective complaints, however, the surveillance tapes indicate that she is able to perform substantial functional activities. (AR 112.)

Dr. Wagner also noted in the record some basis for doubting Norris' credibility, including the fact that the primary reason for continued treatment with Dr. Baker was that he was the only doctor she had found who would sign off on her disability forms. Dr. Wagner also cast doubt on Dr. Baker's objectivity, noting that "the nature of the medical care he has provided has been very superficial" and his "assessments have been superficial as well." (AR 112.)

Based on her review of all the records, including Norris's various medical records and the surveillance tapes, Dr. Wagner opined that Norris is functional on a sedentary level on a full-time basis

23

without any restrictions or limitations. (AR 113.)

## C. Hartford's Decision to Terminate Benefits

Hartford sent Norris a letter dated September 26, 2003 giving notice that it had completed a review of her claim for continued LTD benefits and determined that she no longer met the Policy definition of Total Disability, since it had determined that she was no longer prevented by disability from doing any occupation or work for which she could become qualified by training, education or experience. (See AR 309.) Hartford stated its decision was based upon the policy language and upon its review of all the material contained in Norris's file, including medical records, diagnostic studies, consultative reports, and laboratory work, records from her treating physicians as well as from IMEs, the FCE conducted on May 28, 2003 and an independent medical record review conducted on August 6, 2003, and the surveillance films and reports dated April 15, 2003, May 12, 2003, May 23, 2003, June 3, 2003, and June 19, 2003, a witness statement, her claim forms and telephone interviews with Hartford staff, and an Employability Analysis conducted by a vocational specialist on August 14, 2003. In fact, the letter includes a relatively detailed analysis of the information reviewed in reaching a decision on her case. Ultimately, Hartford concluded that the restrictions Norris reported to her physicians as reflected in her medical records were contradicted by the evidence of her daily activities on the surveillance video. (See AR 309–14.)

Norris appealed the decision (AR 234–35) but Hartford's plan administrator nonetheless issued an opinion upholding the decision to terminate benefits on April 29, 2004. (AR 84–87.) In the letter to Norris's counsel concerning the basis for Hartford's decision, the Appeal Specialist noted that Hartford had "completed a thorough review of [Norris's] claim" before determining that she no longer qualified as "disabled" under the Policy definition. (AR 84.) The Notice of denial of the appeal references the fact that Norris submitted additional medical records in support of her appeal, and states that all these additional records were reviewed along with all the other documentation in Hartford's file, plus the medical review by an independent physician through University Disability Consortium. The Notice also incorporates by reference Hartford's earlier letter of September 26, 2003, which, as indicated above, provided a detailed explanation as to why Norris's benefits were terminated and listed the specific

information referenced in making the decision.  (See AR 1167–72.)

## II.  DISCUSSION

Norris, who proceeds *pro se*, filed her "Motion for Judgment" on June 1, 2005.  Therein, she asserts that she is entitled to judgment as a matter of law on the undisputed facts (Doc. No. 12, at iii); that the standard of review of Hartford's administrative decision should be *de novo* (Doc. No. 12, at iii); that the Policy defines "total disability" as "The inability to perform the material and substantial duties of your own occupation on a full time basis" (Doc. No. 12, at iii); that the decision to terminate her long-term disability benefits was erroneous, extremely unreasonable, and improper (Doc. No. 12, at iii); and that there has been no material change in her condition during the ten years between her first qualifying as disabled and Hartford's decision that she is no longer disabled (Doc. No. 12, at iv).  Norris also attached numerous documents to her Brief, all of which are included in the administrative record.

In its Memorandum in support of its motion for judgment on the record, Hartford essentially argues that under the "arbitrary and capricious" standard of review, its decision to terminate was reasonable based upon the entire administrative record and must therefore be upheld.  (Doc. No. 16.)

In response, Norris filed another Motion for [Judgment]" (Doc. No. 17), which the Court construes as a response in opposition to Hartford's Motion.  In that filing, Norris again posits that the applicable standard of review is *de novo*, that the Court must construe the complaint in the light most favorable to the plaintiff and "accept all well-pleaded allegations of fact as being true."  (Doc. No. 17, at 1.)  In addition, Norris seeks to introduce evidence which is not part of the administrative record. (Doc. No. 17, Attachments.)  Otherwise, she quibbles with evidence in the administrative record,[4] and otherwise simply points to evidence in the record that supports her point of view.

## A.  ERISA Standard of Review

"An employee may challenge a benefit eligibility determination under 29 U.S.C. § 1132(a)(1)(B)."  Yeager v. Reliance Standard Life Ins. Co., 88 F.3d 376, 380 (6th Cir. 1996).  If

---

[4]For instance, Dr. Taylor noted in his file that Norris and her husband told him "they hate people and could never work with people or stand to be around them."  (AR 137, 104.)  Norris claims she never made this statement to Dr. Taylor and that Dr. Taylor misunderstood what Norris's husband told him. (Doc. No. 17, at 6.)

challenged, a plan administrator's denial of benefits is subject to *de novo* review "unless the benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan." McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161, 168 (6th Cir. 2003) (quoting Wilkins v. Baptist Healthcare Sys. Inc., 150 F.3d 609, 613 (6th Cir. 1998)).  When the Plan documents give the plan administrator discretionary authority to determine benefits, the plan administrator's decision to deny benefits will be reviewed "under the 'highly deferential arbitrary and capricious standard of review.' " McDonald, 347 F.3d at 168-69 (quoting Yeager, 88 F.3d at 380).

In this case, as suggested above, the Plan documents clearly grant the Hartford complete authority to interpret the plan and determine eligibility for benefits:

> INTERPRETATION OF POLICY TERMS AND CONDITIONS
> The Hartford has full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy.

(Administrative Record ("AR) 0006 (Plan of Insurance General Provisions).)  It is therefore clear that the "arbitrary and capricious" standard applies in this case.

The arbitrary and capricious standard of review is used "in order to avoid 'excessive judicial interference with plan administration.' " Daniel v. Eaton Corp., 839 F.2d 263, 267 (6th Cir. 1988) (internal quotation marks and citations omitted).  Under this standard, which has been characterized as "the least demanding form of judicial review of administrative action," the outcome of the administrative proceeding will not be considered arbitrary or capricious so long as "it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome." Perry v. United Food & Commercial Workers Dist. Unions 405 & 422, 64 F.3d 238, 241 (6th Cir. 1995) (citations and internal quotation marks omitted).  Thus, the standard requires that the decision "be upheld if it is the result of a deliberate principled reasoning process, and if it is supported by substantial evidence." Baker v. United Mine Workers of Am., 929 F.2d 1140, 1144 (6th Cir. 1991).

Although the arbitrary and capricious standard is highly deferential, such deference " need not be abject, " and " [d]eferential review is not no review." McDonald, 347 F.3d at 172 (internal quotation marks and citations omitted).  Rather, review under the arbitrary and capricious standard

> inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues.  Otherwise, courts would be rendered to

26

nothing more than rubber stamps for any plan administrator's decision as long as the plan was able to find a single piece of evidence—no matter how obscure or untrustworthy—to support a denial of a claim for ERISA benefits.

Id. (quoting Hackett v. Xerox Corp. Long-Term Disability Income Plan, 315 F.3d 771, 774–75 (7th Cir. 2003)).

## B. The Court May Not Consider Facts Outside the Administrative Record

Notwithstanding Norris's submission of additional information, it is clear that the Court may not, in this case, consider facts outside the administrative record. When applying the arbitrary and capricious standard to review the denial of benefits under an ERISA plan, the Court is "required to consider only the facts known to the plan administrator at the time he made his decision." Yeager, 88 F.3d at 381 (citing Miller v. Metro. Life Ins. Co., 925 F.2d 979, 986 (6th Cir.1991)). The Court will therefore disregard any materials submitted that are not contained in the Administrative Record.

## C. The Administrator's Decision Was Not Arbitrary or Capricious

In the ERISA context, unlike in the context of Social Security benefits, plan administrators are not obliged to accord special deference to the opinions of treating physicians. Black & Decker Disability Plan v. Nord, 538 U.S. 822, 825 (2003). As Hartford points out, in this case Dr. Baker, Norris' rheumatologist, is the only doctor among many who have examined Norris who has ever been willing to characterize her as completely disabled from any kind of work. (Doc. No. 16, at 8.) Dr. Baker made this determination on the basis of one visit with Norris in December 1992, and has steadfastly maintained that conclusion over the years despite any evidence to the contrary.

It is clear from review of both the termination letter dated September 26, 2003 and the decision upholding termination of benefits on appeal dated April 29, 2004 that Hartford's determination was not arbitrary and capricious. Both of these decisions go through a lengthy consideration of the medical record in conjunction with the evidence obtained from the surveillance video and the investigators' notes and observations. As Hartford points out, Norris, on June 19, 2002, completed a Questionnaire in which she claimed to suffer from depression which rendered her unable to function, hypertension, and fibromyalgia, which involved pain in her back, hip, and knee; pain and tenderness in the muscles of her upper back, neck, shoulders, and upper extremities. (AR 0187.) In a similar questionnaire dated June

2001, Norris likewise represented that she was unable to engage in activities in the course of a day and that she required assistance walking and lifting due to pain. (AR 568.)

In the same time frame (September 2001), Dr. Baker described her as "basically status quo," with "all the same symptoms that she had previously," including "pain and discomfort to the upper back, neck, arms, and leg areas" (AR 1199), in addition to "fatigue, and other complaints" (AR 1200). The only change he noted, in his report to Hartford, was that Norris had "shown some improvement since she has been off work, which is to be expected." (AR 1201.) Dr. Baker reiterated his belief that Norris was permanently disabled and would never be able to return to any type of gainful employment, and if she did return to work, she would get worse and would not be able to do the job." (AR 1201.) Likewise in June 2002, Dr. Baker noted again that Norris suffered from consistent pain and discomfort in the upper back and neck, "but also in the lower extremities." (AR 1203.) For physical examination findings, he listed "Pain and tenderness in the muscles of the upper back, neck, and upper extremities with spasm and swelling at times." (AR 1205.)

During the same time frame, a different medical practitioner noted that, as of May 1, 2001, she had been out of Mobic for several weeks but was doing "okay" with some joint discomfort but otherwise showed full range of motion in her upper and lower extremities. (AR 510.) In the summer and fall of 2002, Dr. John Taylor noted that Norris complained of pain in her low back, hips and legs (AR 430–31), bi-lateral knee pain (AR 428–29), but "no low back pain on palp[ation]" (AR 426–27). Likewise, during this time frame, Norris was consistent in her complaints of low-back pain, despite the fact that Dr. Baker's diagnosis of fibromyalgia was based in large part on her reports of pain in her neck and upper back. In other words, Norris's reports to her different practitioners do not appear to be altogether consistent.

Similarly, in May 2003, Dr. Baker opined that Norris had "reached a plateau" but had continued pain and discomfort and he was still unmoved from his position that she absolutely was incapable of performing any type of work. (AR 1208–09.) During the same time frame (March 2003), the only complaint Norris made to Dr. Taylor concerned bi-lateral pain and swelling in her calves for a period of two weeks, though there was no pain on palpation and no swelling or other physical symptoms noted.

(AR 420–21.) Dr. Taylor's records from May 2003 reflect that Norris requested an orthopedic referral for her knees, and also was concerned about her hearing – though a hearing test revealed no abnormalities. (AR 259–60.) In July 2003, Norris met one last time with Dr. Taylor, who refused to fill out her paperwork for disability. **(AR 256–57.)** She found a new treating physician after that, but apparently not one who would fill out her disability paperwork.

While her medical evidence is somewhat inconsistent, the greatest inconsistency in the record is that between the reported results from her May 2003 Functional Capacity Evaluation and the surveillance notes and videotape from the same day. On the day of the evaluation, May 28, 2003, Norris was observed on videotape moving with an antalgic gate to exit from her car and walk into the clinic. (AR 212.) Further, the FCE notes that Norris reported she was able to walk for no more than ten minutes at a time, drive for ten minutes, sit for ten minutes, and stand for ten minutes. (AR 1529.) During the cardiovascular aspect of the screening, Norris reported extreme fatigue and claimed she had to stop and rest after walking two or three minutes, despite the fact that there was no corresponding rise in her heart rate. (AR 1529.) Later that same day, the surveillance videotape depicts Norris as moving around without any apparent difficulty or limitations for the remainder of that day, including walking around the shopping center for nearly forty-five minutes while waiting for her husband to arrive, riding in the car and shopping with her husband for more than an hour, and then shopping at the Home Depot for another forty-five minutes, including standing at the paint counter for more than ten minutes. (AR 213, 215–16.)

Hartford also commissioned an Independent Medical Record Review in August 2003 by Dr. Michael O'Hanlan, who ultimately concluded that Norris's more recent physical examinations did not indicate any "significant limitations on physical musculoskeletal examinations," and that the surveillance videotape and the FCE report suggested a less than complete and voluntary effort on Norris's part. (AR 325–26.) On the basis of Dr. O'Hanlan's review, Hartford conducted an employability analysis, and concluded that there were jobs in the national market that were within Norris's capabilities. Further, even though Dr. O'Hanlan's opinion supported Hartford's decision to terminate benefits, Hartford commissioned a second medical record review in April 2004, after its initial decision to terminate

29

benefits but prior to upholding the decision on appeal, by Dr. Andrea Wagner. Dr. Wagner, like Dr. O'Hanlan before her, found significant inconsistencies in the medical records, a complete lack of objective findings, and very superficial assessments and treatments by Dr. Baker. Dr. Wagner, like Dr. O'Hanlan, determined that Norris should be capable of functioning in the workplace at a sedentary level.

In a nutshell, the Court simply cannot say that Hartford's decision was arbitrary and capricious. As demonstrated in both the September 26, 2003 letter and the April 29, 2004 notice upholding the denial decision, Hartford conducted a thorough review of the record as a whole, including two independent medical record reviews, several independent medical examinations, a functional capacity evaluation, and an employability analysis. Among all of that information, Hartford chose not to credit fully the opinion of one treating physician, Dr. Baker. Hartford has offered a "reasoned explanation, based on the evidence, for [this] particular outcome." Perry v. United Food, 64 F.3d at 241. The decision appears to be "the result of a deliberate principled reasoning process," and it is "supported by substantial evidence." Baker v. United Mine Workers, 929 F.2d at 1144. Accordingly, Hartford's termination of benefits must be upheld.

## IV. CONCLUSION

Hartford's decision to terminate Sheila Norris's benefits was reasonably based upon its thorough review of the administrative record as a whole, and based upon the opinions of numerous medical professionals who have determined that Norris is capable of performing work at the sedentary level. Because the decision cannot remotely be characterized as arbitrary or capricious, the Court will GRANT Hartford's Motion for Judgment and DENY Norris's Motion for Judgment.

An appropriate order will enter.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge

Case 3:05-cv-00067   Document 18   Filed 10/13/05   Page 30 of 30 PageID #: 178